SAFE ENERGY COALITION OF MICHIGAN, et al., Petitioners,

v.

U.S. NUCLEAR REGULATORY COMMISSION and United States of America, Respondents,

The Detroit Edison Company, Intervenor.

No. 88–1184.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 14, 1988.

Decided Feb. 3, 1989.

Robert Guild, with whom Richard E. Condit, Washington, D.C., and Billie P. Garde, Appleton, Wis., were on the brief, for petitioners.

Carolyn F. Evans, Atty., Nuclear Regulatory Com'n, of the bar of the State of Mo., pro hac vice, by special leave of court, with whom William H. Briggs, Jr., Sol., E. Leo Slaggie, Deputy Sol., Nuclear Regulatory Com'n, Peter R. Steenland, Jr. and John T. Stahr, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Thomas A. Baxter and Jay E. Silberg, Washington, D.C., were on the brief, for intervenors.

Before MIKVA, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Petitioners, Safe Energy Coalition of Michigan and Sisters, Servants of the Immaculate Heart of Mary Congregation, seek review of a Nuclear Regulatory Commission order denying their request that the NRC take certain actions with respect to an "employee concern" program established by intervenor, Detroit Edison Company, the licensee of the Fermi–2 nuclear power plant. We conclude that the NRC's refusal to undertake the actions that petitioners requested constitutes an agency enforcement decision unreviewable under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and we therefore deny the petition for review.

## I. BACKGROUND

NRC regulations require that each licensee of a nuclear power plant establish a "quality assurance program" to monitor "all activities affecting the safety-related functions" of the plant. 10 C.F.R. Part 50, App. B ("Appendix B"), Intro. (1988). The provisions of Appendix B governing "corrective action" by the licensee specify that:

> Measures shall be established to assure that conditions adverse to quality, such as failures, malfunctions, deficiencies, deviations, defective material and equipment, and nonconformances are promptly identified and corrected. In the case of significant conditions adverse to quality, the measures shall assure that the cause of the condition is determined and corrective action taken to preclude repetition. The identification of the significant condition adverse to quality, the cause of the condition, and the corrective action taken shall be documented and reported to appropriate levels of management.

*Id.*, Criterion XVI. In addition, the licensee must maintain records consisting, at minimum, of: "Operating logs and the results of reviews, inspections, tests, audits, monitoring of work performance, and materials analyses." *Id.*, Criterion XVII. Other NRC regulations, apart from Appendix B, require that certain types of safety-related concerns be reported by the licensee to the NRC. *See, e.g.*, 10 C.F.R. § 50.55(e) (1988)

(design and construction defects that could affect safety). Pursuant to these regulations, Detroit Edison established a quality assurance program for the Fermi–2 plant.

Though not required to do so, Detroit Edison also hired an outside consulting firm to establish and operate a separate "employee concern" program, called SAFETEAM, in order to elicit safety concerns from persons involved in plant construction and operation. According to the program director, SAFETEAM "never included the pursuit of corrective or remedial action ... in response to a safety concern. The program is strictly a means of eliciting concerns which are investigated and, if confirmed, referred to the appropriate organization for action."

## A. *NRC Investigations*

Prior to the (in)action under review, the NRC conducted several "routine safety inspection[s]" into the operation of the SAFETEAM program pursuant to its "General Statement of Policy and Procedure for NRC Enforcement Actions," which is directed toward "[e]ncouraging ... the prompt identification and reporting of potential safety problems." 10 C.F.R. Part 2, App. C, I (1988). These investigations each culminated in a report, of which the critical one for present purposes is the October 1985 report of the Regional Inspector. The NRC coordinated its 1985 inspection with Detroit Edison's own review of SAFETEAM. Under this arrangement, the licensee reviewed SAFETEAM's treatment of approximately 67 percent of the "safety-related concerns" identified to the program, and NRC inspectors examined more than 10 percent of the safety concerns, with the result that 8.5 percent were reviewed by both the licensee and the NRC. The NRC report identified "isolated examples" of problems with SAFETEAM: for instance, "[i]nadequate interviews" and "incomplete documentation." The NRC concluded, however, that "[o]verall ... the [safety-related] concerns were adequately addressed" by the program.

## B. *The Section 2.206 Request*

NRC regulations provide that "[a]ny person may file a request to institute a proceeding ... to modify, suspend or revoke a license, or for such other action as may be proper...." 10 C.F.R. § 2.206(a). In response, "the Director of the NRC office with responsibility for the subject matter of the request shall either institute the requested proceeding ... or shall advise the person who made the request in writing that no proceeding will be instituted in whole or in part, with respect to his request, and the reasons therefor." 10 C.F.R. § 2.206(b).

In May 1987, petitioners filed a section 2.206 request, alleging that Detroit Edison had undertaken the SAFETEAM program in order to divert safety concerns from the quality assurance program regulated by Appendix B and to identify "whistleblowers" for retaliation by utility management. Petitioners called upon the NRC to take three specific actions: (1) "take possession of all SAFETEAM files and review the allegations for all potential safety related deficiencies, and make these concerns public"; (2) "require that all SAFETEAM allegations are processed by the utility in accordance with ... Appendix B"; and (3) "require that all utility employees are *fully* informed about the SAFETEAM program before they make a choice between submitting information to SAFETEAM or the NRC." (Emphasis in original.)

The Director of the Office of Nuclear Reactor Regulation denied petitioners' request. In response to the allegation that Detroit Edison had harassed those who expressed safety concerns to SAFETEAM, the Director noted that petitioners had "provide[d] no specific information to support its claim," even when the NRC asked them to do so. The Director emphasized that "none of the [previous] inspections or the [Office of Investigations' 1985] evaluation [of SAFETEAM] identified deficiencies in the licensee's treatment of safety-related issues with respect to the requirements of ... Appendix B." He added:

While the NRC encourages programs like SAFETEAM, such programs are vol-

untary and are not required by NRC regulations. The requirements of ... Appendix B, have been and are currently adequately implemented by the Fermi–2 quality assurance program.

Since the Commission itself did not undertake to review this Director's decision within 25 days, 10 C.F.R. § 2.206(c)(1), it became the final action of the agency in December 1987.

## II. MOOTNESS

■ As of June 1988, Detroit Edison had begun to phase out the SAFETEAM program, and we understand that this process has been completed during the pendency of this appeal. The government argues that these events moot petitioners' section 2.206 request and our review of its denial. A case is rendered moot when events so unfold as to preclude the possibility of meaningful relief. *Public Media Center v. FCC,* 587 F.2d 1322, 1326 (D.C.Cir.1978). An order requiring the NRC to apply Appendix B to SAFETEAM and to inform workers about the comparative merits of SAFETEAM would hardly be meaningful relief, of course, now that the program has been terminated.

Petitioners' request for other relief is still viable, however. Recall that, as part of its October 1985 report, the NRC reviewed only a small sample of the safety-related concerns raised to SAFETEAM, and did not make public any specific problems identified therein. The NRC could still accord petitioners meaningful relief, therefore, with respect to their requests that (1) the agency take possession of the SAFETEAM files, review them all for safety-related concerns, and make such concerns public, and that (2) it require the licensee to reprocess all previously received SAFETEAM allegations pursuant to Appendix B. If petitioners are correct that Appendix B should have been applied to SAFETEAM, the NRC could examine the raw data and interviews contained in the files to determine whether SAFETEAM properly documented, reported, and corrected safety-related concerns in light of Criteria XVI and XVII of Appendix B.

Should this review identify any deficiencies in the licensee's performance, the NRC could then compel it to take corrective action on authority of Appendix B. Accordingly, these two of petitioners' three requests present a live controversy regarding the application of Appendix B.

## III. REVIEWABILITY

The Administrative Procedure Act provides for judicial review of final agency orders except where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Pursuant to this exception, the Supreme Court, in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed. 2d 714 (1985), held that an agency's refusal to undertake enforcement action upon request is presumptively unreviewable. The Court has expressly reserved, however, the question whether *Chaney* applies to our review of the NRC's declination to act on a section 2.206 request. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 735 n. 8, 105 S.Ct. 1598, 1602 n. 8, 84 L.Ed.2d 643 (1985). We must now answer that question, and we do so by reasoning from the principles of *Chaney.*

### A. *Presumption of Unreviewability*

Petitioners initially argue that *Chaney* is inapplicable, on the ground that their section 2.206 request "was not a request for enforcement action. On the contrary, it was a request for a 'legal determination' on the application of Appendix B to programs like SAFETEAM." Petitioners' request made no similar attempt to distinguish the "legal" question of the applicability of Appendix B from the issue of whether the NRC should act to enforce Appendix B against SAFETEAM. While the agency, as a logical matter, would have to answer this "legal" question before it could determine whether to enforce the requirements of Appendix B, it would be untrue to *Chaney* for us to permit petitioners to evade the presumption of unreviewability by artificially carving out this antecedent legal issue.

The plaintiffs in *Chaney* were a group of death row inmates. In order to forestall

their executions by the lethal injection of drugs approved by the Food and Drug Administration only for other purposes, they called upon the FDA to apply the statutory prohibition of "misbranding." Specifically, the inmates petitioned the FDA to "take various investigatory and enforcement actions" to prevent the use of the contested drugs in executions, "to affix warnings to the labels of all the drugs stating that they were unapproved and unsafe for human executions," and to inform manufacturers and prison officials of the agency's change in policy. 470 U.S. at 824, 105 S.Ct. at 1652. The FDA refused to take such enforcement action, noting, among other grounds, that its jurisdiction over "the unapproved use of approved drugs for human execution" was "unclear." *Id.* The FDA would thus have had to make a "legal determination" regarding its jurisdiction before it could have undertaken the action requested by the inmates. The Supreme Court, nonetheless, addressed the inmates' petition in terms of the ultimate relief to which their legal premises were directed, *viz.*, agency enforcement of the law against use of approved drugs for an unapproved purpose.

■ Here, the unmooted portion of petitioners' section 2.206 request calls upon the NRC to determine that its regulation (Appendix B) applies to "programs like SAFETEAM," and to take specific enforcement steps with respect to SAFETEAM on the premise that implementation of the program was inadequate under the criteria of Appendix B. There is no meaningful distinction between petitioners' request and the one at issue in *Chaney.* Accordingly, we hold that petitioners' section 2.206 request falls squarely within the category of "enforcement" actions held presumptively unreviewable by *Chaney.*

In a footnote to *Chaney,* the Supreme Court noted that it was not presented with "a situation where ... the agency has 'consciously and expressly adopted a general policy' [of non-enforcement] that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n. 4, 105 S.Ct. at 1653 n. 4 (quoting *Adams*

*v. Richardson,* 480 F.2d 1159, 1162 (D.C. Cir.1973) (*en banc*)). Though the Court stopped short of stating that the presumption of unreviewability is inapplicable in such circumstances, it did note that "in those situations the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'" 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4. Inevitably, appellants contend that the NRC's refusal to apply Appendix B to Detroit Edison's SAFETEAM program constitutes such an "abdication" of its statutory responsibility, under the Atomic Energy Act, "to ensure adequate protection of the public health and safety." *Union of Concerned Scientists v. NRC,* 824 F.2d 108, 120 (D.C.Cir. 1987).

The *Chaney* footnote speaks of an agency "consciously and expressly" adopting a "general policy" of non-enforcement. The NRC's opinion does not indicate whether refusal to extend Appendix B to SAFETEAM is part of a general policy applicable to all voluntary "employee concern" programs. For present purposes, however, we will assume its generality. The *Chaney* footnote also contemplates a policy "so extreme" that it amounts to "abdication." Here, the NRC has merely refused to extend its quality assurance regulations to a voluntary employee concern program that the licensee established as a supplement to its required program, which so far as the record here reveals, has been operated in compliance with those regulations. The NRC has hardly taken the position that it may refuse to demand compliance with its quality assurance regulations where they do apply; it has done nothing of the sort. We conclude, therefore, that this case does not involve an agency's "abdication" of its statutory responsibilities within the meaning of the question reserved in *Chaney.* Thus far, the presumption of unreviewability stands.

**B.** *Rebuttal*

■ A claimant may rebut the presumption against review of agency non-enforcement decisions "where the substantive statute has provided guidelines for the agency

to follow in exercising its enforcement powers." *Chaney,* 470 U.S. at 833, 105 S.Ct. at 1656 (footnote omitted). Petitioners point to three potential sources of such statutory guidance: the Atomic Energy Act itself, Appendix B, and a prior NRC decision, the latter two presumably as interpretations of the statute.

1. *Statutory Provisions.* Petitioners point to procedural sections of the Act providing that the NRC, in fulfilling its broad substantive mandate to "protect health," 42 U.S.C. § 2201(b), must require submissions from licensees to assure safety, 42 U.S.C. § 2232; and conduct hearings on license applications. 42 U.S.C. § 2239(a)(1). In addition, petitioners note that the Act also makes a final NRC order granting, suspending, or revoking a license subject to judicial review. 42 U.S.C. § 2239(b).

Petitioners read these statutory provisions as evincing a congressional desire to subject NRC decisions, in general, to judicial review. As a practical matter, however, the procedural limitations cited by petitioners do not provide any guidance to, let alone constrain, the agency in its efforts to "protect health." They do not supply any criteria by which a reviewing court can measure the NRC's refusal to enforce safety regulations against a voluntary program like SAFETEAM and can find such a policy (if it is one) wanting. Nonetheless, according to petitioners, application of *Chaney* would be anomalous, since reviewability would "never be in doubt" if the "same questions of NRC responsibility were the product of agency initiated rulemaking or adjudication...." The point of *Chaney,* however, is to distinguish enforcement decisions from those other forms of agency action for purposes of judicial review. We conclude, therefore, that the cited provisions do not displace the presumption of unreviewability.

2. *NRC Regulations.* It is clear that "regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review of agency action." *Center for Auto Safety v. Dole,* 846 F.2d 1532, 1534 (D.C.Cir.1988); *cf. Amalgamated Meat*

*Cutters and Butcher Workmen v. Connally,* 337 F.Supp. 737, 758–59 (D.D.C. 1971) (textually standardless wage and price control legislation upheld against nondelegation attack, in light of the President's implicit obligation to circumscribe his discretion through promulgation of "further standards"). In this regard, petitioners emphasize two passages from Appendix B. First, at its outset, Appendix B is made applicable "to all activities affecting the safety-related functions of [plant] structures, systems, and components...." Appendix B, Intro. Petitioners take this statement to indicate that the NRC must apply Appendix B to voluntary programs such as SAFETEAM insofar as they deal with safety-related concerns. Second, Appendix B requires that the licensee take measures "to assure that conditions adverse to quality ... are promptly identified and corrected." *Id.,* Criterion XVI. Petitioners argue that, because of the NRC's refusal to apply Appendix B to SAFE-TEAM, "the NRC can have no basis for assuring that such defects have been properly considered."

Reading Appendix B as a whole reveals the error introduced by petitioners' selective quotation of the regulation. Appendix B defines the required elements of the licensee's quality assurance program, not the extent of NRC regulatory authority apart from such a program. *See id.,* Criterion II ("The applicant shall establish ... a quality assurance program which complies with the requirements of this appendix."). Appendix B specifies that the licensee's quality assurance program must encompass "all activities affecting the safety-related functions" of the plant, not that all quality assurance activities must be conducted under the aegis of that regulation. Appendix B simply does not bear upon, much less govern, the NRC's determination of whether to apply the same criteria to a supplemental employee concern program voluntarily undertaken by the licensee.

3. *NRC Precedent.* This court has held that "an agency pronouncement is transformed into a binding norm if so intended by the agency ... and [that] agency intent, in turn, is 'ascertained by an examination

of the statement's language, the context, and any available extrinsic evidence.'" *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir.1987) (quoting *Doe v. Hampton*, 566 F.2d 265, 281–82 (D.C.Cir.1977)). Petitioners accordingly refer us to *Consolidated Edison Co. of New York*, 2 N.R.C. 173 (1975), as a source of binding principles for the disposition of section 2.206 requests.

Under current regulations, the NRC retains authority, *sua sponte*, to review for abuse of discretion the Director's disposition of a section 2.206 request, 10 C.F.R. § 2.206(c)(1), but it will not entertain a petition to review such a decision. 10 C.F.R. § 2.206(c)(2). Prior to promulgation of this provision, 42 Fed.Reg. 36240 (1977), however, NRC practice permitted such review petitions. *Consolidated Edison* arose under the old procedure. In that case, the NRC discussed the standards under which it would review the Director's denial of a section 2.206 request for initiation of a "show cause" proceeding, a form of enforcement action in which the NRC calls upon the licensee to respond to particular allegations. *See* 10 C.F.R. § 2.202. The NRC stated: "The Director correctly understood that a show cause order would have been required had he reached the conclusion that substantial health or safety issues had been raised." 2 N.R.C. at 176 (footnote omitted).

We note at the outset that the current abuse of discretion standard for *sua sponte* review by the NRC is not a source of law to apply within the meaning of *Chaney*. We therefore turn to the applicability of the "substantial health or safety issues" standard mentioned in *Consolidated Edison*. Unlike their counterparts in that case, petitioners did not specifically request a "show cause" order here. We understand them to contend, however, that the NRC should be held to the standard of *Consolidated Edison* in responding to section 2.206 petitions generally. They note that the Supreme Court, in *Lorion*, cited *Consolidated Edison* in a *dictum* to the effect that the NRC "interprets § 2.206 as requiring the issuance of an order to show cause when a citizen petition raises 'substantial health or safety issues.'" 470 U.S.

at 732, 105 S.Ct. at 1601. In *Lorion*, however, the Court addressed only the distinct question of whether initial subject matter jurisdiction to review an NRC order denying a section 2.206 petition resides in the court of appeals or in the district court. As we observed earlier, the Supreme Court expressly declined to determine the reviewability of the NRC's action in light of *Chaney*, *id.* 470 U.S. at 735 n. 8, 105 S.Ct. at 1602 n. 8, and, accordingly, did not inquire whether the agency intended to be bound by this earlier interpretation.

Following a line of inquiry consistent with the law of this circuit as outlined in *Padula*, the First Circuit recently examined the effect of *Consolidated Edison* in the context of the NRC's denial of a section 2.206 request that it order a nuclear power plant licensee to "show cause" why its plant should not remain closed or why its operating license should not be suspended pending resolution of certain safety issues. *Massachusetts Public Interest Research Group v. NRC*, 852 F.2d 9, 11 (1988). The court first observed that "*Chaney* cast significant doubt upon whether a mere policy statement, as opposed to a properly adopted agency rule, can ever provide law to apply." *Id.* at 17 (citing *Chaney*, 470 U.S. at 836, 105 S.Ct. at 1658). More narrowly, the court pointed out that the reference to a "substantial health or safety issue" appeared in the context of "a standard of review protective of the agency's discretion." 852 F.2d at 17. For example, after likening the Director to a prosecutor and itself to a reviewing court, the NRC stated that its regulations "vest[ ] in the Director the discretion to institute show cause proceedings." *Consolidated Edison*, 2 N.R.C. at 175. The analogy to prosecutorial discretion is, of course, among the reasons the Supreme Court gave in *Chaney* for holding administrative enforcement decisions presumptively within the agency's unreviewable discretion. 470 U.S. at 832, 105 S.Ct. at 1656.

Based upon its review of *Consolidated Edison* as a whole, the First Circuit concluded that:

No indication exists that the agency *intended* to bind itself to a standard of "substantial health or safety issues." ... Rather the agency issued the ruling before the Court decided *Chaney*, at a time when agencies presumed that courts could review all non-enforcement decisions; the NRC statement reflects that legal presumption. It establishes a flexible standard of review respectful of the agency's necessary discretion; it does not reflect an intent to restrict that discretion.

852 F.2d at 18 (emphasis in original). Mindful of the potential distinction between the decision to allow reopening of the power plant in *Mass. PIRG* and the non-enforcement decision here, we find the First Circuit's analysis of *Consolidated Edison* persuasive in the only context before us and, therefore, do not view that NRC opinion as a binding norm for the treatment of section 2.206 petitions.

### IV. CONCLUSION

Petitioners have failed to rebut *Chaney*'s presumption that the NRC's disposition of their request for enforcement action is unreviewable. Accordingly, their petition for review is

*Denied.*