359 F.3d 156
 RIVERKEEPER, INC., Petitioner,
v.
Samuel J. COLLINS, Director, Office of Nuclear Reactor Regulation, Dr. William Travers, United States Nuclear Regulatory Commission, Entergy Nuclear Indian Point 2, LLC, Entergy Nuclear Indian Point 3, LLC, and Entergy Nuclear Operations, Inc., Respondents.
 Docket No. 03-4313.
 United States Court of Appeals, Second Circuit.
 Argued: January 9, 2004.
 Decided: February 24, 2004.
 
 Karl S. Coplan, Pace Environmental Litigation Clinic, Inc. (Nicolette Witcher, Paula Butler, and Jason C. D'Ambrosio, on the brief), White Plains, NY, for Petitioner.
 Jared K. Heck, Attorney, U.S. Nuclear Regulatory Commission (Karen D. Cyr, General Counsel, John F. Cordes, Jr., Solicitor, E. Leo Slaggie, Deputy Solicitor, Thomas L. Sansonetti, Assistant Attorney General, U.S. Department of Justice, and John T. Stahr, Attorney, U.S. Department of Justice, on the brief), Washington, DC, for Respondents Samuel J. Collins, Dr. William Travers, and United States Nuclear Regulatory Commission.
 Jay E. Silberg, Shaw Pittman LLP (Matias F. Travieso-Diaz, Blake J. Nelson, and John M. Fulton, on the brief), Washington, DC, for Respondents Entergy Nuclear Indian Point 2, LLC, Entergy Nuclear Indian Point 3, LLC, and Entergy Nuclear Operations, Inc.
 Robert D. Snook, Assistant Attorney General of Connecticut (Richard Blumenthal, Attorney General of Connecticut, on the brief), Hartford, CT, for Amicus Curiae Richard Blumenthal.
 Before: VAN GRAAFEILAND, SACK, and RAGGI, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 In the wake of the September 11, 2001, terrorist attacks on New York City and Arlington, Virginia, the petitioner, Riverkeeper, Inc., ("Riverkeeper") requested that the respondent United States Nuclear Regulatory Commission (the "NRC" or the "Commission") condition the license of the respondent Entergy Nuclear Operations, Inc., ("Entergy") to operate, through respondents Entergy Nuclear Indian Point 2, LLC, and Entergy Nuclear Indian Point 3, LLC, two nuclear power plants in Westchester County, New York (collectively, "Indian Point"), on several safety-related changes pertaining to their operation. Riverkeeper's principal concern was the potential for terrorist use of an airplane in a September-11-type attack on these plants. Riverkeeper's request included implementation of a permanent no-fly zone over Indian Point, a defense system to protect this no-fly zone, and conversion of the spent-fuel storage at Indian Point to a dry-cask system. The NRC issued a decision on November 18, 2002, denying Riverkeeper's request in relevant part, from which Riverkeeper appeals.
 
 
 2
 Riverkeeper raises grave concerns about the safety of Indian Point in the face of the risk of airborne terror attacks. We nonetheless conclude that we have no subject matter jurisdiction to entertain this appeal. The Administrative Procedure Act, as interpreted by the Supreme Court, creates a heavy presumption against our jurisdiction over an appeal from the NRC's denial of Riverkeeper's request for an enforcement action. Riverkeeper fails utterly to overcome that presumption. The appeal is therefore dismissed.
 
 BACKGROUND
 
 3
 Riverkeeper is a nonprofit organization whose mission is to protect the Hudson River and the supply of drinking water for New York City and Westchester County. Less than two months after the September 11, 2001, terrorist attacks, Riverkeeper filed a request with the NRC pursuant to 10 C.F.R. § 2.206 seeking to condition Entergy's license to operate Indian Point on particular safety measures that Riverkeeper was convinced were necessary to safeguard the nuclear plants from similar attacks. Riverkeeper sought, in relevant part, the "obtainment of a permanent no-fly zone from the Federal Aviation Administration in the air space within 10 nautical miles of the Indian Point facility";[1] "a defense and security system sufficient to protect and defend the no-fly zone"; and "the immediate conversion of the current spent fuel storage technology from a water cooled system to a dry cask system in a bunkered structure."[2] Riverkeeper, Inc.'s Section 2.206 Request for Emergency Shutdown of Indian Point Units 2 and 3, at 2 (Nov. 8, 2001).[3]
 
 
 4
 Riverkeeper argued in its request that these and other protections were necessary because nuclear power plants in general and Indian Point in particular are plausible targets for terrorist attacks. Riverkeeper presented reports by the media and the International Atomic Energy Agency, a United Nations organization, of documented threats against nuclear facilities after September 11, 2001. Riverkeeper also posited that Indian Point is a uniquely likely target because (1) approximately twenty million people reside within fifty miles of the facility, (2) major financial centers in New York City are less than fifty miles away, (3) nearby reservoirs supply all of Westchester County's and much of New York City's drinking water, and (4) Indian Point is near major transportation systems vital to the regional and national economy.
 
 
 5
 Riverkeeper argued, moreover, that Indian Point is vulnerable to a terrorist attack, especially an intentional crash of an airplane into the facility similar to those successfully carried out against the World Trade Center and the Pentagon on September 11, 2001. In particular, Riverkeeper asserted that there is a possibility of breach of, inter alia, the operating reactors or the spent-fuel storage facilities. In Riverkeeper's view and as the NRC has conceded, Indian Point was not designed to withstand an airborne terrorist attack comparable to the September 11 attacks. Riverkeeper cited a 1982 report by Argonne National Laboratory prepared for the Department of Energy estimating the serious damage that could result from the ignition of airline fuel upon impact with a nuclear reactor structure. According to Riverkeeper, the spent-fuel storage facility's design renders it particularly vulnerable. A successful attack on that facility could, according to Riverkeeper, lead to a loss of cooling water in the spent-fuel pools, which could ultimately cause an exothermic reaction followed by a dangerous fire and then release deadly amounts of radiological material into the environment.
 
 
 6
 Riverkeeper also contended, in reliance on NRC studies, that the impact of a terrorist attack on Indian Point could be devastating, causing hundreds of immediate fatalities nearby and at least 100,000 latent cancer deaths downwind. In Riverkeeper's view, a meltdown at even one of the Indian Point facilities would have extraordinary environmental consequences and result in at least $500 billion in property damage.
 
 
 7
 Riverkeeper therefore asked the NRC to exercise its "broad discretionary powers to grant [Riverkeeper's] requests" in the interest of "protect[ing] the public, environment, and property" beyond its statutory duty to provide adequate protection. Id. at 18-19.
 
 
 8
 On December 20, 2001, NRC Office of Nuclear Reactor Regulation Director Samuel Collins declined to order an immediate closure of Indian Point. On May 16, 2002, Director Collins issued a proposed decision that would deny the relevant relief that Riverkeeper requested. Riverkeeper commented on the proposed decision, requesting reconsideration. It argued that "the proposed decision would protect the operators' economic interests at the expense of the safety and security of the surrounding population." Comments on May 16, 2002 Proposed Director's Decision on Riverkeeper's November 8th Petition 2.206 Request for Emergency Shutdown of Indian Point Units 2 and 3, at 1 (Aug. 9, 2002).
 
 
 9
 On November 18, 2002, Director Collins issued a decision. In it, he denied the bulk of Riverkeeper's request, although he deemed granted that part of the request that sought an immediate security upgrade, which the NRC had already implemented, and he stated that the NRC was prepared to change security requirements as necessary to ensure what it thought to be adequate protection of the public. He also deemed granted, in part, Riverkeeper's request for a full review of the facility. With respect to the remaining part of Riverkeeper's request, the director determined that "Indian Point has sufficient security measures in place to defend itself from a broad spectrum of potential terrorist attacks." Entergy Nuclear Operations, Nos. 50-003, 50-247, and 50-286, at 5 (Nuclear Regulatory Comm'n Nov. 18, 2002). He elaborated:
 
 
 10
 [N]uclear power plants are among the most hardened and secure industrial facilities in our nation. The many layers of protection offered by robust plant design features, sophisticated surveillance equipment, physical security protective features, professional security forces, access authorization requirements, and NRC regulatory oversight provide an effective deterrence against potential terrorist activities that could target equipment vital to nuclear safety.
 
 
 11
 Id. at 6. The director conceded that the NRC's "design basis threat" (NRC requirements for the defense of nuclear power plants) did not consider airborne terrorist attacks like those which occurred on September 11, 2001. Id. at 9. But he asserted that since then the NRC had taken at least three specific actions to respond to the threat of such an attack. First, the NRC is in the process of reexamining the design basis threat for modification as appropriate. Id. Second, the NRC implemented interim security measures as "prudent to address the current threat environment in a consistent manner throughout the nuclear reactor industry," the full details of which would not be made public for security reasons. Id. at 8. The decision nonetheless generally described such measures as including:
 
 
 12
 increased patrols, augmented security forces and capabilities, additional security posts, installation of additional physical barriers, vehicle checks at greater stand-off distances, enhanced coordination with law enforcement and military authorities and more restrictive site access controls for all personnel. [NRC] Orders also directed licensees to evaluate and address potential vulnerabilities to maintain or restore cooling to the core, containment, and spent fuel pool and to develop specific guidance and strategies to respond to an event resulting in damage to large areas of the plant due to explosions or fires.
 
 
 13
 Id. at 8-9. The NRC also "require[d] additional security measures pertaining to the owner-controlled land outside of the plants' protected areas." Id. at 17. All of these measures were to remain in effect until the NRC decided that other measures should take their place or that the threat environment has changed significantly. Id. at 9. Third, the decision outlined the NRC's post-September 11 coordination with other federal agencies, including "the Office of Homeland Security, the Federal Bureau of Investigation..., the Departments of Transportation and Energy, and others," in seeking to render nuclear facilities secure.[4] Id. at 8.
 
 
 14
 With respect specifically to Riverkeeper's request for a permanent no-fly zone and defense and security of such a zone, Director Collins denied the request after explaining the NRC's view that security from terrorist attacks on nuclear facilities was best approached by enhancing aviation security, including intelligence gathering and security at airports and on airplanes.[5] Id. at 18-19. And with respect to converting to a dry-cask spent-fuel storage system, the director denied Riverkeeper's request, asserting that the present system is safe.[6] Id. at 20-22.
 
 
 15
 The director's decision automatically became final after twenty-five days of inaction by the NRC.[7] See 10 C.F.R. § 2.206(c)(1). Riverkeeper appealed the NRC's decision thus rendered final to this Court.
 
 
 16
 On June 4, 2003, the respondents moved to dismiss the appeal on jurisdictional grounds. On August 28, 2003, this Court referred the motion to a merits panel of the Court for decision after full briefing and oral argument. Order Dated Aug. 28, 2003, Riverkeeper, Inc. v. Collins, (2d Cir.2003). After such briefing and argument, we now dismiss the appeal for lack of jurisdiction.
 
 DISCUSSION
 
 17
 Riverkeeper appeals the NRC's decision to deny Riverkeeper's request to the extent that the NRC did not implement a permanent no-fly zone over Indian Point, did not require defense or security of such a no-fly zone, and did not order Entergy to change Indian Point's spent-fuel storage to a dry-cask system.[8] Riverkeeper asserts that we have jurisdiction to review the NRC's decision because it constituted an abdication of the NRC's statutory duty to protect and ensure the health and safety of the public. The respondents reply that the NRC did not abdicate its statutory duties in refusing to implement Riverkeeper's particular request, and thus jurisdiction cannot arise on that basis. Furthermore, they contend, we have no jurisdiction because neither the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 et seq., (the "AEA") nor NRC regulations contain any standard against which we can meaningfully judge the director's decision and which could give rise to appellate jurisdiction. They conclude that we therefore do not have jurisdiction to review the NRC's decision.
 
 I. Basis for Jurisdiction
 
 18
 The AEA requires that the NRC ensure that "the utilization or production of special nuclear material ... will provide adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a). The statute grants the NRC the power to:
 
 
 19
 [E]stablish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property.
 
 
 20
 42 U.S.C. § 2201(b). Under the NRC's regulations, the Commission "may institute a proceeding to modify, suspend, or revoke a license or to take such other action as may be proper." 10 C.F.R. § 2.202(a). "Any person may file a request to institute a proceeding pursuant to § 2.202 to modify, suspend, or revoke a license, or for any other action as may be proper." Id. § 2.206(a). In response to this request, "the Director of the NRC office with responsibility for the subject matter of the request shall either institute the requested proceeding in accordance with this subpart or shall advise the person who made the request in writing that no proceeding will be instituted in whole or in part, with respect to the request, and the reasons for the decision." Id. § 2.206(b). Within twenty-five days after the denial of a request, the NRC "may on its own motion review that decision, in whole or in part, to determine if the Director has abused his discretion." Id. § 2.206(c)(1).
 
 
 21
 The federal courts of appeals have exclusive jurisdiction to adjudicate appeals from "all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42." 28 U.S.C. § 2342(4).[9] 42 U.S.C. § 2239, in turn, makes "[a]ny final order entered in any proceeding of the kind specified in subsection (a)," reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"). 42 U.S.C. § 2239(b)(1). The Supreme Court has construed 42 U.S.C. §§ 2239(a)[10] and (b)(1) to "provide for initial court of appeals review of all final orders in licensing proceedings whether or not a hearing before the Commission occurred or could have occurred." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 737, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Such final orders include an NRC denial of a request under 10 C.F.R. § 2.206, such as the denial in the instant case. Id. at 734-35, 737, 105 S.Ct. 1598. Therefore, if this Court has subject matter jurisdiction under the APA of the appeal of the NRC's decision on Riverkeeper's section 2.206 request, the question to which we now turn, Riverkeeper's appeal of the director's decision, which became final and therefore the decision of the NRC twenty-five days after its issuance, is properly before this Court.
 
 
 22
 II. Jurisdiction To Review the NRC's Decision
 
 
 A. Presumption Against Jurisdiction
 
 
 23
 The APA permits judicial review for "[a] person suffering legal wrong because of agency action," 5 U.S.C. § 702, but explicitly excludes any such review "to the extent that — (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," id. § 701(a). In Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court discussed and distinguished between the operation of sections 701(a)(1) and 701(a)(2).
 
 
 24
 The Chaney Court observed that section 701(a)(1) forecloses judicial review "when Congress has expressed an intent to preclude judicial review." Id. at 830, 105 S.Ct. 1649. "[E]ven where Congress has not affirmatively precluded review," however, section 701(a)(2) forecloses review "if the statute [governing the agency's actions] is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute (`law') can be taken to have `committed' the decisionmaking to the agency's judgment absolutely." Id.
 
 
 25
 Chaney included among those agency actions presumptively exempted from judicial review by section 701(a)(2) agency decisions not to institute a particular enforcement action. Id. at 838, 105 S.Ct. 1649. The Chaney Court explained:
 
 
 26
 First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.... The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities....
 
 
 27
 [Second], ... when an agency refuses to act it generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.... Finally, we recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict — a decision which has long been regarded as the special province of the Executive Branch.
 
 
 28
 Id. at 831-32, 105 S.Ct. 1649 (emphasis in original).
 
 
 29
 In Chaney, prison inmates who had been sentenced to death by lethal injection petitioned the Food and Drug Administration ("FDA") for enforcement of the Federal Food, Drug, and Cosmetic Act ("FDCA"). Id. at 823, 105 S.Ct. 1649. The inmates alleged that the drugs used to carry out the death penalty were "misbranded," in violation of the FDCA, because the drugs' use for human execution was an "unapproved use of an approved drug." Id. at 823-24, 824 n. 1, 105 S.Ct. 1649 (quoting 21 U.S.C. § 352(f)). The FDA denied the inmates' petition. Id. at 824-25, 105 S.Ct. 1649. The Supreme Court, applying the reasoning rehearsed above, decided that federal courts presumptively had no subject matter jurisdiction to review the FDA's denial of the inmates' petition for enforcement. Id. at 837-38, 105 S.Ct. 1649.
 
 
 30
 The Chaney Court decided, however, that the presumption against reviewability under section 701(a)(2) would be rebutted by a showing that "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 832-33, 105 S.Ct. 1649. In such a case, the reviewing court has the power to decide whether the agency's action is contrary to the statute or applied the statute in a manner that was arbitrary or capricious. See id. at 833-35, 105 S.Ct. 1649.
 
 
 31
 The Chaney Court applied these principles to the case before it and held that the FDCA did not cabin the FDA's discretion to refuse to institute enforcement proceedings. Id. at 835-37, 105 S.Ct. 1649. The Court therefore dismissed the inmates' appeal for lack of subject matter jurisdiction.
 
 
 32
 In a footnote, the Court posited the possibility that section 701(a)(2)'s presumption against federal judicial jurisdiction in those cases in which the substantive statute did not provide "[a] meaningful standard against which to judge the agency's exercise of discretion," id. at 830, 105 S.Ct. 1649, might be overcome on a showing that the agency in question "has `consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," id. at 833 n. 4, 105 S.Ct. 1649 (quoting Adams v. Richardson, 480 F.2d 1159, 1162 (D.C.Cir.1973) (en banc)). The Court noted that in such a situation, "the statute conferring authority on the agency might indicate that such decisions were not `committed to agency discretion.'" Id. (quoting 8 U.S.C. § 701(a)(2)). The Court had no occasion in deciding Chaney, however, nor has it had occasion since, to apply this hypothetical "abdication" principle to the presumption of non-reviewability.
 
 
 33
 The present petition challenges a different agency and a different statute. It raises, however, a similar issue: whether we have jurisdiction to review the NRC's decision not to enforce what Riverkeeper asserts are applicable AEA provisions and NRC regulations with respect to Entergy and Indian Point. Because the NRC is an agency thus declining to enforce, its decision is presumptively not reviewable unless the presumption is overcome by one of the means recognized by Chaney.[11]
 
 
 34
 
 B. Rebutting the Presumption Against Non-Reviewability
 
 
 
 35
 1. Meaningful Statutory Standard? Section 701(a)(2) forecloses review when "agency action is committed to agency discretion by law." As we have seen, the Chaney Court read the section to prevent judicial review "even where Congress has not affirmatively precluded review ... if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Chaney, 470 U.S. at 830, 105 S.Ct. 1649. Riverkeeper does not, however, attempt to demonstrate that the NRC's denial of its section 2.206 request was reviewable on this ground — that "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833, 105 S.Ct. 1649.[12]
 
 
 36
 2. Express Abdication of Statutory Responsibility? Riverkeeper relies instead on the hypothetical basis for jurisdiction reserved in Chaney's footnote 4 for cases in which the agency in question "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." Chaney, 470 U.S. at 833 n. 4, 105 S.Ct. 1649 (internal quotation marks omitted). But Riverkeeper does not direct us to an NRC policy expressly abdicating any relevant statutory responsibility. Rather, Riverkeeper asks us to identify the existence of an NRC policy not to consider "potential terrorist attacks by airborne vehicles" on nuclear facilities based on a pre-September 11 NRC rule and two NRC decisions about environmental impact review under a governing statute other than the AEA. Petitioner's Br. at 25 (citing Physical Protection for Spent Nuclear Fuel and High-Level Radioactive Waste, 63 Fed.Reg. 26,955 (May 15, 1998) (codified at 10 C.F.R. pts. 60, 72, 73, 74, and 75); In the Matter of Private Fuel Storage, L.L.C., 56 N.R.C. 340 (2002); In the Matter of Duke Energy Corp., 56 N.R.C. 358 (2002)). We do not think that these NRC actions with respect to matters unrelated either to a September-11-type attack or the AEA are relevant to the denial of Riverkeeper's section 2.206 request under the AEA in the wake of September 11. Riverkeeper has thus not identified an express agency policy for us to measure against the AEA to determine whether an NRC policy is consistent with or an abdication of its responsibility under the AEA's commands.
 
 
 37
 3. Inference of Abdication of Statutory Responsibility. Riverkeeper also asks us to infer a general NRC policy of abdication from the NRC's act of denying Riverkeeper's request with respect to Indian Point. As the District of Columbia Circuit has pointed out, however,
 
 
 38
 By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion. [Moreover], an agency's pronouncement of a broad policy against enforcement poses special risks that it "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," Chaney, 470 U.S. at 833 n. 4, 105 S.Ct. 1649 (internal quotation marks omitted), a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc.
 
 
 39
 Crowley Caribbean Transp., Inc. v. Peña, 37 F.3d 671, 677 (D.C.Cir.1994). Nonetheless, in the absence of such an "expression[] of broad enforcement polic[y]," we review the actions of the NRC here to determine whether we can discern from them an abdication of responsibilities conferred upon the NRC by the AEA.
 
 
 40
 The NRC must, under the AEA, ensure that "the utilization or production of special nuclear material ... will provide adequate protection to the health and safety of the public." 42 U.S.C. § 2232(a).[13] The AEA further authorizes the NRC to regulate in various formats as it "may deem necessary or desirable ... to protect health or to minimize danger to life or property." 42 U.S.C. § 2201(b); see also id. § 2201(i)(3) (granting authority to the NRC to regulate as it finds necessary "to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property"); County of Rockland v. U.S. Nuclear Regulatory Comm'n, 709 F.2d 766, 769 (2d Cir.) ("The NRC is charged under the AEA ... with primary responsibility to ensure, through its licensing and regulatory functions, that the generation and transmission of nuclear power does not unreasonably threaten the public welfare. Consistent with its administrative mandate, the NRC is empowered to promulgate rules and regulations governing the construction and operation of nuclear power plants."), cert. denied, 464 U.S. 993, 104 S.Ct. 485, 78 L.Ed.2d 681 (1983). As the District of Columbia Circuit observed, the first cited statutory section requires the NRC to ensure "adequate protection" of public health and safety, not "absolute protection." Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm'n, 824 F.2d 108, 114 (D.C.Cir.1987); see also id. at 118 ("The level of adequate protection need not, and almost certainly will not, be the level of `zero risk.' This court long has held that the adequate-protection standard permits the acceptance of some level of risk."). The latter statutory sections go further and "empower[] (but do[] not require) the Commission to establish safety requirements that are not necessary for adequate protection and to order holders of or applicants for operating licenses to comply with these requirements." Id. at 114. Taken together, these statutory provisions require that the NRC insure adequate protection of public health and safety from risks associated with nuclear plants.[14] The NRC can be viewed as abdicating its statutory duties, then, only if it has established a policy not to protect adequately public health and safety with respect to nuclear plants.
 
 
 41
 If the NRC had indisputable proof before it that nuclear power plants are not adequately secure from terrorist attack and nonetheless decided that it would do nothing to address the situation, Riverkeeper might then plausibly charge that the NRC had "abdicated" its statutory responsibility.[15] But that is not what the NRC did. After September 11, 2001, the NRC issued multiple orders modifying licenses (albeit mostly in ways that, for reasons asserted to relate to security, have not been disclosed) "to strengthen licensees' capabilities and readiness to respond to a potential attack on a nuclear facility" by requiring "certain compensatory measures... as prudent, interim measures, to address the generalized high-level threat environment in a consistent manner throughout the nuclear reactor community." All Operating Power Reactor Licensees; Order Modifying Licenses (Effective Immediately), 67 Fed.Reg. 9792, 9792 (Mar. 4, 2002); see also All Operating Power Reactor Licensees; Order Modifying Licenses (Effective Immediately), 68 Fed.Reg. 24,510, 24,511 (May 7, 2003); All Operating Power Reactor Licensees; Order Modifying Licenses (Effective Immediately), 68 Fed.Reg. 24,514, 24,514 (May 7, 2003); All Operating Power Reactor Licensees; Order Modifying Licenses (Effective Immediately), 68 Fed.Reg. 1643, 1643 (Jan. 13, 2003). The NRC also modified the design basis threat, requiring power plant licensees to "revise their physical security plans, safeguards contingency plans, and guard training and qualification plans" in an undisclosed fashion. All Operating Power Reactor Licensees; Order Modifying Licenses (Effective Immediately), 68 Fed.Reg. 24,517, 24,517-18 (May 7, 2003).
 
 
 42
 To be sure, none of the NRC's disclosed actions appears to be directed specifically toward Riverkeeper's express concern: the possibility of an airborne terrorist attack on Indian Point. But this does not constitute an abdication.
 
 
 43
 First, the NRC has an overall statutory mandate to provide adequate protection to nuclear plants. It has not abdicated that responsibility solely because it has failed to enact the specific licensing requirements requested by Riverkeeper after consulting with military and security agencies and because it has implemented various undisclosed protective measures to address the heightened concerns of terrorist attacks. Were it otherwise, we would be reading the Chaney footnote to have created jurisdiction on an "abdication" basis every time an administrative agency declines to order demanded action on an asserted discrete, perceived problem within its area of statutory responsibility. The Chaney Court made clear the strict limitations on the judicial power to review administrative agency decisions. We are confident that in thus shutting the front door to federal courts, it did not mean to open a back door permitting federal courts to assert jurisdiction whenever a specific problem is brought to an agency's attention and the agency decides not to order demanded curative steps with respect to it. Such an exception to the rule that failure to institute an enforcement action is generally not reviewable would threaten to devour the rule.
 
 Second, the NRC has stated that:
 
 44
 In the aftermath of September 11, 2001, the Federal government took a number of steps to improve aviation security and minimize the threat of terrorists using airplanes to damage facilities critical to our nation's infrastructure. The Commission views that the efforts associated with protecting our nation from terrorist attacks by air should be directed toward enhancing security at airports and on airplanes. Thus, the Commission endorses the prompt response by Congress to strengthen aviation security under the Aviation and Transportation Security Act of 2001, because this legislation provides for improved protection against air attacks on all industrial facilities, both nuclear and non-nuclear. The NRC further supports the steps taken by the FAA to improve aircraft security, including enhanced passenger and baggage screening, strengthening of cockpit doors, and the Air Marshal program. The U.S. intelligence community and various Federal law enforcement agencies have also increased efforts to identify potential terrorists and prevent potential attacks before they occur. For example, the FAA and Department of Defense have acted more than once to protect airspace above nuclear power plants from what were thought to be credible threats against certain specific sites. These potential threats were later judged to be non-credible.
 
 
 45
 Entergy Nuclear Operations, Nos. 50-003, 50-247, and 50-286, at 18-19 (Nuclear Regulatory Comm'n Nov. 18, 2002).[16] It is on this basis, at least in part, that the NRC declined to commence enforcement proceedings as urged in the section 2.206 request before us.
 
 
 46
 We think that the NRC's considered conclusion — right or wrong — that the problem before it was being adequately addressed by other agencies of government and its consequent decision to leave the matter to those agencies cannot amount to an "abdication" of its statutory duty under the AEA to insure that the public health and safety is adequately protected. Relying on other governmental bodies to address a risk is not equivalent to ignoring the risk. See N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 331 (2d Cir.2003) ("The [Chaney] presumption against judicial review of [agency] refusal [to pursue enforcement action] avoids entangling courts in a calculus involving variables better appreciated by the agency charged with enforcing the statute and respects the deference often due to an agency's construction of its governing statutes."); cf. Kelley v. Selin, 42 F.3d 1501, 1511 (6th Cir.) ("As the Supreme Court has stated, `the [Nuclear Regulatory] Commission is making predictions ... at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.' Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted). After all, judges are neither scientists nor technicians." (alterations in original; some internal quotation marks and alterations omitted)), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995).
 
 
 47
 Thus, even if we were to assume that the Chaney Court established by way of footnote 4 federal court jurisdiction over appeals from agency action when the agency "has `consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities," Chaney, 470 U.S. at 833 n. 4, 105 S.Ct. 1649,[17] the only basis for jurisdiction urged by Riverkeeper, we would have no jurisdiction to review the NRC's decision here.
 
 
 48
 * * * * * *
 
 
 49
 The issues Riverkeeper raises are plainly serious and of pressing concern. But as a court established by Congress under Article III of the Constitution, we have jurisdiction to decide only those disputes that the Constitution or Congress gives us the power to decide. "[T]he decision as to whether an agency's refusal to institute proceedings should be judicially reviewable" is "essentially [left] to Congress, and not to the courts." Chaney, 470 U.S. at 838, 105 S.Ct. 1649. It is clear under the Administrative Procedure Act, and its interpretation by the Supreme Court in Chaney, that we have been given no such power here.
 
 
 50
 As we observed under not altogether dissimilar circumstances more than two decades ago:
 
 
 51
 One of the most emotional issues confronting our society today is the adequacy of safety measures at nuclear power facilities. Fueled by the Three Mile Island incident, the debate over nuclear safety persists as public interest groups charge that serious problems remain and operator-utilities seek to assure the public that all reasonable measures have been taken to protect surrounding populations in the event of a major nuclear accident. But it is the United States Nuclear Regulatory Commission ... which must decide the difficult questions concerning nuclear power safety.
 
 
 52
 County of Rockland, 709 F.2d at 768.
 
 CONCLUSION
 
 53
 For the foregoing reasons, Riverkeeper's appeal is dismissed for want of jurisdiction.
 
 
 
 Notes:
 
 
 [1]
 An NRC regulation governs the requirement that a nuclear plant licensee protect the plant from radiological sabotageSee Requirements for Physical Protection of Licensed Activities in Nuclear Power Plant Reactors Against Radiological Sabotage, 10 C.F.R. § 73.55. To "provide high assurance that activities involving special nuclear material are not inimical to the common defense and security and do not constitute an unreasonable risk to the public health and safety," id. § 73.55(a), a plant shall have physical security, physical barriers, access requirements, alarms, communication requirements, testing and maintenance, and a response requirement, id. §§ 73.55(b)-(h).
 
 
 [2]
 An NRC regulation governs the requirements for physical protection of stored spent nuclear fuel and high-level radioactive wasteSee Requirements for the Physical Protection of Stored Spent Nuclear Fuel and High-Level Radioactive Waste, 10 C.F.R. § 73.51. This regulation requires nuclear plant licensees to ensure that spent-fuel storage "do[es] not constitute an unreasonable risk to public health and safety." Id. § 73.51(b)(1). To comply with this standard, a licensee must, among other things, store waste only within a protected area and limit access to the area, none of which requires the use of dry-cask spent-fuel storage. See id. §§ 73.51(b)(2), (d). In 1998, the NRC modified its regulations to require "protection [of spent-fuel storage] against the malevolent use of a land-based vehicle," and considered but chose not to require protection from an airborne vehicle. Physical Protection for Spent Nuclear Fuel and High-Level Radioactive Waste, 63 Fed. Reg. 26,955, 26,956 (May 15, 1998) (codified at 10 C.F.R. pts. 60, 72, 73, 74, and 75).
 
 
 [3]
 Riverkeeper's request, in full, was that the NRC (1) order that Indian Point be shut down temporarily to conduct a review of the facility; (2) require Entergy to provide information documenting its security measures; (3) modify the Indian Point licenses to mandate a permanent no-fly zone, defense and security of the no-fly zone, and defense and security of the entire facility; (4) order the revision of Entergy's emergency response plan and Westchester County's radiological emergency response plan to account for terrorist attacks; (5) permanently retire Indian Point if security cannot be sufficiently guaranteed; and (6) convert the spent-fuel storage to a dry-cask system
 
 
 [4]
 According to the decision:
 Shortly after September 11, 2001, the NRC recognized the need to reexamine the basic assumptions underlying the current nuclear facility security and safeguards programs.... This is an ongoing review and as results become available, they will be evaluated and, if appropriate, incorporated into NRC's regulatory processes. The review includes consultation with the Office of Homeland Security, the Federal Bureau of Investigation (FBI), the Departments of Transportation and Energy, and others. The NRC's participation with these agencies allows the NRC to communicate its actions to other Federal agencies, ensuring an appropriate and balanced response throughout the nation's entire critical energy infrastructure.
 Entergy Nuclear Operations, Nos. 50-003, 50-247, and 50-286, at 7-8 (Nuclear Regulatory Comm'n Nov. 18, 2002).
 
 
 [5]
 According to the decision:
 In the aftermath of September 11, 2001, the Federal government took a number of steps to improve aviation security and minimize the threat of terrorists using airplanes to damage facilities critical to our nation's infrastructure. The Commission views that the efforts associated with protecting our nation from terrorist attacks by air should be directed toward enhancing security at airports and on airplanes. Thus, the Commission endorses the prompt response by Congress to strengthen aviation security under the Aviation and Transportation Security Act of 2001, because this legislation provides for improved protection against air attacks on all industrial facilities, both nuclear and non-nuclear. The NRC further supports the steps taken by the [Federal Aviation Administration ("FAA")] to improve aircraft security, including enhanced passenger and baggage screening, strengthening of cockpit doors, and the Air Marshal program. The U.S. intelligence community and various Federal law enforcement agencies have also increased efforts to identify potential terrorists and prevent potential attacks before they occur. For example, the FAA and Department of Defense have acted more than once to protect airspace above nuclear power plants from what were thought to be credible threats against certain specific sites. These potential threats were later judged to be non-credible.
 The NRC is also reviewing measures to bolster defense and to establish new antiterrorism strategies in a thorough and systematic manner. The NRC is taking a realistic and prudent approach toward assessing the magnitude of the potential threat and the strength of licensee defenses.
 NRC licensees must defend nuclear power plants against the [design basis threat]. September 11 showed that the NRC and its licensees must reevaluate the scope of potential assaults of all types. However, there are limits to what can be expected from a private guard force, even assisted by local law enforcement. Even if it is determined that nuclear power plants should be defended against aircraft attack, the NRC cannot expect licensees to acquire and operate antiaircraft weaponry. Protection against this type of threat may be provided by other means within the Federal government.
 In summary, [Riverkeeper's] request is denied because the NRC considers that the collective measures taken since September 11, 2001, provide adequate protection of public health and safety.
 Id. at 18-19.
 
 
 [6]
 According to the decision:
 The NRC staff presently concludes that spent fuel can be safely stored at the [Indian Point] reactor site in the current system.... Although the spent fuel storage buildings at [Indian Point] are not as hardened as the reactor containment structures, the [spent-fuel pools] themselves are robust, and relatively small structures, that are partially below ground level.... The pools are designed to prevent a rapid loss of water with the structure intact, and the pool water level and cooling system are monitored and alarmed in the control rooms. Thus, the response time for events involving the [spent-fuel pool] is significantly longer than for other event scenarios. It is also easier to add water to the [spent-fuel pool] from various sources because it is an open pool. The robust design and small size of the pools minimize the likelihood that a terrorist attack would cause damage of a magnitude sufficient to result in an offsite release of radioactive material. Further, offsite resources can be brought onsite to assist the response to an event.
 When the NRC staff completes its reevaluation of the physical security requirements, the NRC will be able to judge whether modifications to the [spent-fuel pool] structures and enclosures are warranted and whether additional safeguards measures should be established. If so, the NRC will act accordingly. In the meantime, the NRC has issued Orders to all nuclear power plants requiring certain interim compensatory measures to augment security and strengthen mitigation strategies. The [spent-fuel pools] are within the protected area of the facility and therefore protected from certain external threats under the security provisions identified in the [physical security plans].
 During the NRC review of the transfer of the licenses for [Indian Point], [Entergy] indicated that it was evaluating the possible construction of an independent spent fuel storage facility. In a public meeting on March 14, 2002, [Entergy] stated that it was expediting its engineering review for this facility.
 Id. at 20-22.
 
 
 [7]
 We therefore refer to it hereafter as either the "director's decision" or the "NRC's decision."
 
 
 [8]
 The Attorney General of Connecticut submitted a briefamicus curiae in support of Riverkeeper's petition. The brief argues that Indian Point's radiological emergency preparedness plan is inadequate. Although Riverkeeper made similar arguments in its section 2.206 request, it has not pursued them on appeal. We therefore do not consider them now. See Bano v. Union Carbide Corp., 273 F.3d 120, 127 n. 5 (2d Cir.2001) ("[B]ecause [an issue] was raised by amici, not by the appellants themselves, ... we do not reach the question [raised by amici]." (citing, inter alia, 16A Wright, Miller & Cooper, Federal Practice & Procedure § 3975.1 (3d ed. 1999))). We note, moreover, that this question is now before the NRC in a section 2.206 request filed by the amicus. See Entergy Nuclear Operations, Inc.; Receipt of Request for Action Under 10 C.F.R. 2.206, 68 Fed.Reg. 41,187 (July 10, 2003).
 
 
 [9]
 In 1974, Congress abolished the Atomic Energy Commission and established in its place (1) the Energy Research and Development Administration, 42 U.S.C. § 5811, whose functions were later transferred to the Department of Energy,id. § 7151, and (2) the NRC, id. § 5841. Section 2342(4) therefore applies to "all final orders" of the NRC "made reviewable by section 2239 of title 42."
 
 
 [10]
 Section 2239(a) provides, in pertinent part, that:
 In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.
 42 U.S.C. § 2239(a)(1)(A).
 
 
 [11]
 Riverkeeper argues in its reply brief that we have jurisdiction because the relief sought from the NRC was not purely enforcement relief, and thereforeChaney need not be strictly applied. We need not consider this issue because it was raised for the first time in Riverkeeper's reply brief. See Knipe v. Skinner, 999 F.2d 708, 710-11 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief."). In any event, because the thrust of Riverkeeper's section 2.206 petition was to convince the NRC to enforce the statutes and regulations under its authority against licensees in the manner in which Riverkeeper thought they should be enforced, we conclude that the case before us is properly construed under Chaney as an appeal from the denial of an enforcement action.
 
 
 [12]
 While we are therefore not called upon to address the issue, it is worth noting that other circuits that have done so have determined that neither the AEA nor the NRC regulations concerning section 2.206 requests limit agency discretion sufficiently to enable meaningful judicial reviewSee Safe Energy Coalition v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477-78 (D.C.Cir.1989); Arnow v. U.S. Nuclear Regulatory Comm'n, 868 F.2d 223, 234-36 (7th Cir.), cert. denied sub nom. Citizens of Illinois v. U.S. Nuclear Regulatory Comm'n, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989); Mass. Pub. Interest Research Group, Inc. v. U.S. Nuclear Regulatory Comm'n, 852 F.2d 9, 16 (1st Cir.1988).
 
 
 [13]
 Congress also made a specific finding that "[t]he processing and utilization of source, byproduct, and special nuclear material must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public." 42 U.S.C. § 2012(d)
 
 
 [14]
 Circumstances today are sufficiently different from those of a generation ago that we do not find ourselves compelled to follow the District of Columbia Circuit's 1969 conclusion that the Atomic Energy Commission, "in licensing the construction of nuclear reactors for peaceful civilian use," need not "take into account, and require a showing of effective protection against, the possibilities of attack or sabotage by foreign enemies."Siegel v. Atomic Energy Comm'n, 400 F.2d 778, 779, 784 (D.C.Cir.1968).
 
 
 [15]
 Cf. Texas v. United States, 106 F.3d 661, 667 (5th Cir.1997) ("We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty. The State does not contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decided to abdicate their enforcement responsibilities. Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty.").
 
 
 [16]
 We are aware that the NRC has asserted this same reasoning in other contextsSee, e.g., SECURITY GAP: A Hard Look at the Soft Spots in Our Civilian Nuclear Reactor Security, Staff Summary of Responses by the Nuclear Regulatory Commission to Correspondence from Rep. Edward J. Markey, at 8 (Mar. 25, 2002); Letter from NRC Chairman Richard A. Meserve to Sen. James M. Jeffords, at 10-11 (Dec. 17, 2001). Whether multiple uses of this reasoning rise to the level of an "express" policy does not alter our conclusion.
 
 
 [17]
 No party has directed us to, nor can we locate, a decision by a court of appeals that has found, in performing theChaney analysis, a federal agency to have abdicated its statutory duties. Cf. Safe Energy Coalition, 866 F.2d at 1477 (concluding that there is no subject matter jurisdiction under Chaney to review the NRC's denial of a section 2.206 request that the NRC act on an "employee concern" program established by a power plant licensee, and that the NRC did not abdicate its statutory responsibilities in its denial); Arnow, 868 F.2d at 236 (dismissing for lack of subject matter jurisdiction under Chaney the petitioners' appeal from the NRC's denial of a section 2.206 request for an order to show cause why certain nuclear plants should not be suspended from operation and retested because of inadequate containment in the event of a nuclear accident, but indicating that had there been evidence that "the NRC abdicated its statutory responsibilities," there could be judicial review); Mass. Pub. Interest Research Group, Inc., 852 F.2d at 19 (holding that although it had no jurisdiction under Chaney to review the NRC's denial of a section 2.206 request based on alleged inadequacies in offsite emergency response plans and design flaws in a nuclear plant's containment structure, "courts ... may review NRC decisions which undermine its fundamental statutory responsibility to protect the health and safety of the public" (citation and internal quotation marks omitted)).