**CROWLEY CARIBBEAN TRANSPORT, INC.; Crowley Maritime Corporation, Appellants**

v.

**Federico F. PEÑA, Secretary of Transportation; Lykes Bros. Steamship Company, Inc., Appellees.**

No. 92–5362.

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1994.

Decided Oct. 21, 1994.

Mark P. Schlefer, Washington, DC, argued the cause for appellant. With him on the briefs was William H. Fort, Washington, DC.

Douglas A. Wickham, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. With him on the brief were Eric H. Holder Jr., U.S. Atty. and John D. Bates, R. Craig Lawrence, and Jeffrey T. Sprung, Asst. U.S. Attys., Washington, DC.

On the brief for appellee Lykes Bros. S.S. Co., Inc., was Timothy B. Shea, Washington, DC.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge.

Crowley Caribbean Transport carries freight on U.S.-flag ships to the port of Las Minas on the Atlantic coast of Panama. In 1990 Lykes Brothers Steamship Company proposed to initiate cargo service on foreign-flag vessels to Balboa on the Pacific coast, less than fifty miles (and ninety minutes by truck) from Las Minas. Fearing that this proposed service might run afoul of provisions of the Merchant Marine Act of 1936 designed to protect U.S.-flag carriers (such as Crowley) from competition from foreign-flag vessels operated by subsidized domestic carriers, Lykes applied to the Maritime Administrator for a waiver of the rules. The Administrator denied Lykes's waiver application, and in so doing explained that no waiver was necessary because the proposed service

did not compete with Crowley's existing service within the meaning of the statute.

Crowley brought this suit challenging the Administrator's determination and seeking to enjoin Lykes's Pacific-coast service to Panama, which has since begun operation. The district court granted summary judgment against Crowley, and we affirm. The claims Crowley raises against the Administrator are ones for which no judicial relief is available, and Crowley has asserted no independent claims of error with respect to Lykes.

## I.

Section 804(a) of the Merchant Marine Act of 1936 makes it "unlawful" for any carrier that "receiv[es] an operating differential subsidy ... directly or indirectly to own, charter, ... or operate any foreign-flag vessel which competes with any American-flag service determined by the Secretary of Transportation to be essential...." 46 U.S.C.App. § 1222(a). Section 804(b), however, permits the Maritime Administrator to waive the requirements of § 804(a) "[u]nder special circumstances and for good cause shown." *Id.* § 1222(b). A carrier that violates § 804(a) is subject to fines. *Id.* § 1228.

Lykes receives operating differential subsidies for its American-flag vessels and also operates foreign-flag vessels. It does not dispute that § 804(a) restricts its use of the foreign-flag vessels. In late 1990, it applied for a § 804(b) waiver to operate its foreign-flag vessels along several routes to Central America, South America, and Africa. In the course of denying most of the requested waivers for lack of specificity, the Administrator noted that "to the extent Lykes requests authority to operate foreign-flag vessel [*sic*] in areas which would not compete with any essential American-flag service, then no section 804 waiver is necessary."

Lykes then requested further guidance regarding the routes for which a waiver was not required. Specifically, Lykes asked whether it needed a waiver to operate foreign-flag ships to certain South American and African ports, claiming that "[t]o [its] knowledge no other U.S.-flag liner service is provided in this trade." The Administrator

replied that no waiver was required for any of these services "since they are not directly competitive with other U.S.-flag services within the meaning of section 804 of the Merchant Marine Act, 1936, as amended."

By means that the record does not disclose, Crowley obtained copies of this correspondence and, in a letter to the Administrator, took issue with Lykes's assertion that its proposed service would not compete with other U.S.-flag service. Crowley was particularly concerned with Lykes's proposed service from the United States to Balboa on the Pacific coast of Panama. Crowley regularly carried freight by water directly to Las Minas on the Atlantic coast; in addition, it accepted cargo for other destinations in Panama (including Balboa), for which it issued an intermodal bill of lading and arranged for carriage by truck from Las Minas. Crowley claimed that Lykes's service to Balboa would compete with its intermodal service through Las Minas and that without a § 804(b) waiver such competition would be unlawful. As Crowley's Panamanian service was in a designated "essential trade route"—one of eight so defined by the Administrator, see *Notice of Final Determination of Essential Trade Routes*, 24 SRR 177, 186 (1987)—it was indisputably an "essential" service for purposes of § 804(a).

Despite the apparent rivalry between Lykes and Crowley for some of the same cargo, the Administrator found—in further correspondence precipitated by Crowley's objections—that Lykes did not need a § 804(b) waiver because "[p]orts on Crowley's U.S.-flag service on the Atlantic coast of Panama ... are not on the same trade route as ports in Lykes's service on the Pacific coast of Panama, and therefore vessels calling at these ports are not directly competitive." In determining whether or not the services were actually competitive within the meaning of § 804(a), the Administrator focused only on ports directly served by ocean-going vessels; he did not consider indirect intermodal competition, as Crowley had hoped.

Crowley then sued Lykes and the Department of Transportation. The district court held that although the term "competes" is ambiguous in the context of § 804, the agency's interpretation of the term was reasonable. The court therefore dismissed the suit, and Crowley appealed.

## II.

After oral argument, we asked the parties for supplemental briefs addressing the question of whether "the Administrator's decision that Lykes did not require a § 804(b) waiver to operate foreign-flagged vessels to Balboa constitutes a nonenforcement decision under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (198[5] )." Despite this additional briefing, the exact nature of the Administrator's action remains murky. None of the parties has explained with any authority or precision the manner in which violations of § 804 are prosecuted; in particular, no one has clarified exactly how enforcement authority is shared between the Administrator and the Department of Justice.[1] As a result, we are left without a clear picture of the effects of the Administrator's decision. If the Administrator's statement that Lykes does not require a § 804 waiver for its Pacific-coast Panamanian service means as a practical matter that neither the Department of Justice nor the Department of Transportation will pursue the alleged violation, then the Administrator has in effect declared that he will forego enforcement of § 804(a) in the present case. On the other hand, if the letters have no binding effect on Justice or Transportation and do not guarantee Lykes protection from future government enforcement, then they are simply advisory opinions accompanying what is in substance a denial of Lykes's requests for a waiver. Even after the supplemental briefing, we

---

1. Although we cannot say for certain, it appears from the United States Attorneys' Manual that Justice would act only on a referral from some "client" agency. See United States Attorneys' Manual § 4–6.200. Here, that would presumably be the Maritime Administration, which (by delegation from the Secretary of Transportation) is responsible for encouraging the development of the merchant marine fleet by maintaining the operating differential subsidy program and—at issue here—enforcing its rules. See 46 U.S.C.App. § 1101; 49 CFR §§ 1.66–.67. The Department of Transportation does not possess independent litigating authority in this field.

cannot say which characterization is more accurate.

Whichever characterization is more apt, however, we must affirm the district court's grant of summary judgment in favor of the Maritime Administrator. If we assume that his determination was only a waiver denial plus an advisory opinion, Crowley has not suffered the injury in fact required for it to have standing to bring suit. If, on the other hand, the decision not to require a waiver constituted a determination to forego enforcement, we would be precluded from reviewing that decision under the principles articulated in *Heckler v. Chaney* (assuming, arguendo, that on this scenario Crowley satisfied standing requirements). We address each of these possibilities in turn.

*The Administrator's Letters as an Advisory Opinion*

■ We first assume that government enforcement of § 804(a) is completely entrusted to the Justice Department, which may proceed against Lykes (absent a formal § 804(b) waiver) without any sort of referral from or consent by the Maritime Administrator. Under these assumptions, the Administrator's denial of a waiver and assertion that none was needed would not preclude a future action by Justice to enforce § 804(a); only the actual grant of the waiver by the Administrator could offer such protection.

■ If this is the case, it is difficult to see how Crowley has been injured by the Administrator's determination. What has happened in concrete terms is that Crowley's rival has applied for a waiver, i.e., a kind of immunity from future § 804(a) enforcement, *and that immunity has been denied.* In other words, the Administrator's decision was substantively in Crowley's favor, although it was accompanied by dicta (the interpretation of the term "competes" in § 804(a)) to which Crowley objects. We have made clear, however, that mere disagreement with an agency's rationale for a substantively favorable decision does not constitute the sort of injury necessary for purposes of Article III standing: a litigant's "interest in [an agency's] legal reasoning and its potential precedential effect does not by itself confer standing where, as here, it is

'uncoupled' from any injury in fact caused by the substance of the [agency's] adjudicatory action." *Telecommunications Research and Action Center v. FCC ("TRAC"),* 917 F.2d 585, 588 (D.C.Cir.1990). And without a concrete injury in fact, Crowley may not bring suit against the Administrator. See *Schlesinger v. Reservists Comm. To Stop the War,* 418 U.S. 208, 218–19, 94 S.Ct. 2925, 2930–31, 41 L.Ed.2d 706 (1974). Except possibly in the sense that the Administrator's reasoning may amount to a non-enforcement decision (the hypothesis addressed below), its impact on Crowley is every bit as nebulous and remote as the impact upon the *TRAC* plaintiffs of the FCC's use of a broader rationale than they favored for finding certain programming exempt from the equal-time rules. *TRAC,* 917 F.2d at 586–87.

*The Administrator's Letters as a Non–Enforcement Decision*

■ We now modify the first set of assumptions: we assume that the Administrator's determination that Lykes's Panamanian service does not require a § 804(b) waiver *indeed* telegraphs a definitive judgment that the government will not enforce § 804(a) in this particular instance.

Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), makes judicial review inapplicable "to the extent that ... agency action is committed to agency discretion by law." In *Heckler v. Chaney,* the Supreme Court construed § 701(a)(2) to create a presumption against reviewability for "an agency's decision not to take enforcement action," 470 U.S. at 832, 105 S.Ct. at 1656. The Food and Drug Administration in that case had declined to take enforcement action against states that, in administering lethal injections for capital punishment, had used drugs not approved by the FDA for such use. In so deciding, the FDA had first asserted that its jurisdiction over the unapproved use of approved drugs for execution "was generally unclear but in any event should not be exercised to interfere with this particular aspect of state criminal justice systems." *Id.* at 824, 105 S.Ct. at 1652. It then said that even if it clearly had jurisdiction, it would be "authorized to decline to exercise it

under [its] inherent discretion to decline to pursue certain enforcement matters." *Ibid.* Thus the agency *both* expressed a substantive view of the law on the unapproved use of approved drugs (tentatively, to be sure) *and* invoked its inherent enforcement discretion.

The Court offered several reasons for finding a presumption of non-reviewability of agency non-enforcement decisions. First, it noted the "complicated balancing of a number of factors which are peculiarly within [an agency's] expertise," including the decisions of "whether a violation has occurred" and how to allocate agency resources. *Id.* at 831–32, 105 S.Ct. at 1655–56. Second, it stressed that a decision not to enforce "does not exercise [the agency's] *coercive* power over an individual's liberty or property rights" and that it "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832, 105 S.Ct. at 1656 (emphasis in original). Finally, non-enforcement decisions differed from actions to enforce in that for the latter the "action itself provides a focus for judicial review." *Id.* The Court plainly did not regard these reasons as undermined—or sufficiently undermined, in any event—by the agency's having partially grounded its inaction in an explicit analysis of its statutory power.

█ Crowley suggests that *Chaney*'s presumption of non-reviewability is inapplicable when the agency bases its refusal to enforce in an individual case solely on a legal interpretation without explicitly relying on its enforcement discretion. This is similar (if not identical) to an issue on which the *Chaney* Court reserved judgment, saying that it expressed no opinion as to whether an agency's refusal to initiate enforcement proceedings would be reviewable if it were based solely on the agency's belief that it lacked jurisdiction to take action. 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4. Our most recent pronouncement on the subject is contrary to Crowley's view. In *Safe Energy Coalition v.*

*U.S. Nuclear Regulatory Comm'n,* 866 F.2d 1473 (D.C.Cir.1989), the petitioner had requested the Nuclear Regulatory Commission to enforce a subset of NRC regulations ("Appendix B") against a specific risk-reporting program at Detroit Edison's Fermi–2 nuclear reactor. *Id.* at 1475. The NRC, though noting the petitioner's failure to produce evidence of violations, also explained that the regulatory requirements imposed on Detroit Edison by Appendix B were "adequately implemented" by a completely different program at Fermi–2. *Id.* at 1476. It nowhere invoked enforcement discretion. Petitioners argued that the NRC's "legal determination" as to the limited scope of Appendix B rendered *Chaney* inapplicable, *id.,* but we declined the gambit. Instead, we reasoned that the applicability of *Chaney* depended on the relief sought by petitioners, which was enforcement action. *Id.* at 1477. Even though a full answer to petitioners' request might have required the NRC to settle the legal issue, we said, *Chaney* could not be evaded by "artificially carving out this antecedent legal issue" from the basic request for enforcement. *Id.* at 1476.

It is true that three years before *Safe Energy* we gave a different answer. In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,* 783 F.2d 237 (D.C.Cir.1986), we considered the Department of Labor's refusal, based on its interpretation of the labor statutes, to take enforcement action in response to a union complaint. We held that an agency's statutory interpretation was presumptively reviewable even if announced in the context of a non-enforcement decision. *Id.* at 245–46. Thus *International Union* appears to have "carved out" for review precisely what *Safe Energy* later said could not be carved out. (The petitioner in *Safe Energy* did not cite *International Union* to the court, and the court in turn did not refer to that case.)

As a circuit, we seem to have no explicit rule on how to proceed when we discover inconsistent precedents.[2] Whatever the gen-

---

2. Compare *Dorse v. Armstrong World Industries, Inc.,* 798 F.2d 1372, 1376 (11th Cir.1986) ("Where circuit authority is in conflict, 'we ordi-

narily reject the precedent that is inconsistent with either Supreme Court cases or the weight of authority within the circuit.' [citing cases] ...

eral solution to that dilemma, the answer here is dictated by an intervening decision of the Supreme Court which, though not in the *Chaney* context, squarely rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions. In *ICC v. Brotherhood of Locomotive Engineers ("BLE")*, 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987), the ICC had denied a petition to reconsider, filed after the statutory time limit for appeal had expired. An agency's denial of such a petition is normally entirely within its discretion, but petitioner argued that in this case the denial should be reviewable because it was explicitly based on substantive legal grounds. Writing for the Court, Justice Scalia flatly rejected the principle that if an agency "gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable":

> To demonstrate the falsity of that proposition it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

482 U.S. at 283, 107 S.Ct. at 2368.

Although Justice Scalia was construing the Hobbs Act, he invoked the Administrative Procedure Act, characterizing it as "codif[ying] the nature and attributes of judicial review, including the traditional principle of its unavailability 'to the extent that ... agency action is committed to agency discretion by law'," *id.* at 282, 107 S.Ct. at 2367. (citing § 701(a)(2)). And he cited *Chaney* as an application of the principle. *Id.*[3] Further, he responded to the concurring justices' contention that the principles of *SEC v. Chenery*

*Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), argued for reviewability by noting that *Chenery* addressed only the character of review, not the threshold issue of whether the agency *action* was reviewable. The *BLE* Court's focus on "agency action" of course parallels both § 701(a)(2) itself and our decision in *Safe Energy*. It also reaffirms the Court's statement in *Chaney* that the substantive provisions of the Food, Drug, and Cosmetics Act, far from supplying "law to apply," were "simply irrelevant to the agency's discretion to refuse to initiate proceedings." 470 U.S. at 835–36, 105 S.Ct. at 1658. See. also Ronald M. Levin, Understanding Reviewability in Administrative Law, 74 Minn.L.Rev. 689, 756 & n. 335 (1990) (reading this passage from *Chaney* as casting doubt on possibility of carving reviewable issues out of non-reviewable actions); *id.* at 758 (noting that *International Union* and similar cases are inconsistent with *BLE*); 3 Kenneth C. Davis & Richard J. Pierce, *Administrative Law Treatise* § 17.7, at 150 (1994) (questioning whether *International Union* and similar cases survive in light of *BLE*).

The cases relied upon by Crowley provide no basis for review of the Maritime Administrator's *single-shot* non-enforcement decision (again, assuming that it is even as much as that). Both *Edison Electric Institute v. EPA*, 996 F.2d 326 (D.C.Cir.1993), and *National Wildlife Federation v. EPA*, 980 F.2d 765 (D.C.Cir.1992), hold that an agency's statement of a *general enforcement policy* may be reviewable for legal sufficiency where the agency has expressed the policy as a formal regulation after the full rulemaking process (*NWF*) or has otherwise articulated it in some form of universal policy statement (*Edison*). The cases do not involve an agency's decision to decline enforcement in the context of an individual case.

Where there is no Supreme Court authority on the issue and no clear weight of authority within the circuit, however, 'we must resort to common sense and reason' to determine the appropriate rule of law."), with *Alcorn County v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160 (5th Cir.1984) (presumption in favor of earlier case); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924–25 (3d Cir.1985) (similar).

3. Furthermore, with respect to other areas of administrative procedure, this court has extended the holding in *BLE* beyond the specific context of the Hobbs Act. See *John D. Copanos & Sons, Inc. v. FDA*, 854 F.2d 510, 527 (D.C.Cir. 1988); see also *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 237 (D.C.Cir.1988) (suggesting but not finding non-reviewability).

There are ample reasons for distinguishing the two situations. By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," *Chaney*, 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4 (internal quotation marks omitted), a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc. These latter cases confront courts (as here) with the task of teasing meaning out of agencies' side comments, form letters, litigation documents, and informal communications. Cf. *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1, 4 (D.C.Cir.1987) (finding decision not to initiate rulemaking reviewable, in large part because *Chaney*'s concern that non-enforcement decision would present insufficient focus for review was inapplicable).

It is true that we regularly review agency statements that arise in all manner of informal contexts such as letters, see, e.g., *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689 (D.C.Cir. 1971), but that fact, standing alone, does not suggest a different result here. The Administrator's determination is unreviewable because it is a decision to forego enforcement in this one instance, not simply because it was articulated in the context of a letter. It is conceivable that a document announcing a particular non-enforcement decision would actually lay out a general policy delineating the boundary between enforcement and non-enforcement and purport to speak to a broad class of parties; such a communication might qualify as the sort of general statement of policy reviewable under *Edison* and *NWF*. This will not be true in the ordinary case, however, and the more reasonable inference when faced with a context-bound non-enforcement pronouncement is that the agency has addressed the issue in comparatively ad hoc terms inherently implicating its non-reviewable enforcement discretion.

*Chaney* turns the presumption of reviewability into a presumption the other way, which may be rebutted by showing that "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 833, 105 S.Ct. at 1666; see *Safe Energy Coalition*, 866 F.2d at 1477–78. We can look for such standards in the statute itself, in "regulations promulgated by an administrative agency in carrying out its statutory mandate," *Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C.Cir.1988), or in other binding expressions of agency viewpoint, *Padula v. Webster*, 822 F.2d 97, 100 (D.C.Cir. 1987). Crowley has not pointed to such standards in any form in this case.

### III.

Accordingly, we affirm the district court's order granting summary judgment in favor of the Maritime Administrator. Crowley also named Lykes as a defendant and sought an injunction against its provision of freight service to the west coast of Panama. But Crowley has alleged no independent claims of error warranting reversal of the summary judgment in favor of Lykes. We therefore affirm that portion of the district court's judgment as well.

*So ordered.*